**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Glover,<br><br>             Plaintiff,<br><br>v.<br><br>Charles Ryan, et al.,<br><br>             Defendants. | No. CV-21-00676-PHX-ROS (CDB)<br><br>**ORDER** |

Plaintiff Daniel Glover has filed a Motion for Injunctive Relief requesting the Court order Defendants arrange for him to see a urologist. Defendants argue no such consultation is appropriate. The Court heard evidence and argument on June 30, 2021. The undisputed facts show Plaintiff has made consistent reports of unrelenting pain for approximately six months and Defendants have been unable to determine its cause. At the hearing, one of Plaintiff's medical providers conceded only a specialist could provide a more definitive diagnosis. Therefore, a limited injunction requiring Plaintiff be seen by a urologist will be entered.

**BACKGROUND**

The following facts are undisputed. On September 3, 2019, Plaintiff was seen by a non-party provider, Nurse Practitioner Dorothy Igwe. (Doc. 31-2 at 2.) Plaintiff, who had previously had bilateral inguinal hernias surgically repaired without complication (Docs. 31-1 at 2; 31-2 at 2),[1] reported pain on both sides of his groin, stating his pain level ranged

---

[1] According to the National Institute of Health's *MedlinePlus* website, an inguinal

from 3-7 out of 10 and that ibuprofen helped with his pain. (Doc. 31-2 at 2.) Igwe reported no tenderness, rigidity, guarding, or abdominal or inguinal bulge. (*Id.*) Plaintiff's ibuprofen supply was renewed for 14 days. (*Id.* at 2-3.) Igwe also ordered bloodwork, which she reviewed on September 9, 2019, and found to reveal "no critical levels." (*Id.* at 11.)

On January 8, 2021, Plaintiff submitted a "health needs request" ("HNR") form concerning pain in his left testicle.[2] (*Id.* at 12, 21.) He was seen the next day by non-party Nurse Pontious. (*Id.* at 12.) Plaintiff told Pontious his left testicle had begun shrinking three days ago and he was experiencing a "dull and achy" pain, which he rated a "3 or 4" out of 10. (*Id.* at 12.) Plaintiff denied experiencing any fevers, chills, testicle swelling, or "difficulty with bowel or bladder." (*Id.*) Pontious noted Plaintiff's left testicle was approximately three times smaller than his right testicle and referred him to a provider.[3] (*Id.* at 14, 17.)

On January 11, 2021, Plaintiff saw Defendant Nurse Practitioner Karanja-Adams. (*Id.* at 22.) He told Karanja-Adams he was experiencing a "dull pain" in his lower abdomen that ranged from 3-7 on a scale of 10. (*Id.*) Karanja-Adams found no distention or masses in Plaintiff's abdomen and no indication of testicular torsion, strangulation, or incarceration. (*Id.* at 23.) She nevertheless ordered a testicular and pelvic/lower abdominal ultrasound and obtained Plaintiff's agreement that if the ultrasounds were "approved by the Medical Review Board," Plaintiff would attend the appointment. (*Id.* at 27, 32.) Karanja-Adams also offered Plaintiff an unspecified pain medication, which he declined, and instructed him to continue his "current pain regimen" of ibuprofen. (*Id.* at 25.)

---

hernia is a bulging of an organ or tissue through a weak area of muscle in the groin. *See* https://medlineplus.gov/hernia.html (last visited June 17, 2021.)

[2] For purposes of this discussion, the Court refers to the date on which Plaintiff signed the HNR, not the date it was marked "received."

[3] In general, a prisoner with a medical complaint is seen initially by a nurse and, if the nurse determines it is appropriate, the prisoner is referred to a "provider" for further treatment. The "provider" is often a Nurse Practitioner.

On January 13, 2021, Plaintiff submitted another HNR stating his testicular pain was growing in severity. (*Id*. at 200.) He was seen by Nurse Tanisha Buckner the following day and reported a pain level of 7-8 out of 10. (*Id*. at 191.) Nurse Buckner stated she "educated" Plaintiff on the "HNR process" and instructed him to "contact medical if any new concerns." (*Id.* at 197.)

On January 27, 2021, Plaintiff saw Karanja-Adams and reported he was experiencing pain that increased when he lay flat. (*Id*. at 52.) Plaintiff denied dysuria, hematuria, hesitancy, urgency, frequency, or penile discharge, and exhibited no distention, guarding, rebound, or rigidity.[4] (*Id*.) Karanja-Adams discussed Plaintiff's upcoming ultrasounds and instructed him to continue with his current treatment regimen and to return to the clinic if he experienced increased testicular pain, discoloration, dysuria, hematuria, or increased abdominal pain. (*Id*. at 54.)

On February 14, 2021, Plaintiff submitted another HNR stating his testicular pain had increased and he was trying to "be patient" but "also need[ed] to document the urgency of [his] issue." (*Id*. at 65.) The following day, Plaintiff was seen by Defendant Nurse Graciano, who noted Plaintiff reported "worsening intermittent L[eft] groin pain" that ranged from a 4-10 out of 10, was radiating to his left testicle, and was not being effectively treated with ibuprofen. (*Id*. at 56.) Graciano referred Plaintiff to a "provider for pain management." (*Id*. at 60.)

On February 24, 2021, Plaintiff was seen again by Karanja-Adams. (*Id*. at 66.) Karanja-Adams's notes indicate Plaintiff reported "[w]orsening testicular pain" and "testicular pain/discomfort" but Plaintiff "denied dysuria, hematuria, frequency, urgency or worsening testicular pain." (*Id*. at 66-67.) Karanja-Adams discussed with Plaintiff his upcoming ultrasounds. (*Id*. at 68.)

---

[4] According to the National Institute of Health's *MedlinePlus* website, dysuria is a term for painful urination and hematuria is a term for blood in the urine. *See* https://medlineplus.gov/ency/article/003145.htm (last visited June 17, 2021); https://medlineplus.gov/ency/article/003138.htm (last visited June 17, 2021).

Plaintiff had a "scrotal ultrasound" on March 3, 2021. (Doc. 31-2 at 50-51.) The complete summary of that ultrasound was:

> Ultrasound Scrotum and Contents FINDINGS: Scrotal ultrasound: The RIGHT testicle measures 12.6 x 2.1 x 3.0 cm. The testicle shows normal echotexture without mass or abnormal color flow. The RIGHT epididymis shows a small cyst measuring 2 mm. The LEFT testicle measures 3.4 x 2.5 x 1.6 cm. The LEFT testicle shows normal echotexture without mass or abnormal color flow. The LEFT epididymis shows a small cyst measuring 3 mm. Smallright-sided [sic] hydrocele seen. No significant varicoceles. No significant hernia. CONCLUSION: Small bilateral epididymal cysts. A small RIGHT hydrocele.

By way of comparison, the average size of a testicle is 4 x 3 x 2 cm.[5] Thus, Plaintiff believes the ultrasound findings were obviously incorrect in that the ultrasound indicated Plaintiff's right testicle was very large. In fact, as Plaintiff explained at the evidentiary hearing, a finding that his right testicle was 12.6 x 2.1 x 3.0 cm is roughly equivalent to a finding that Plaintiff's right testicle was the size "of a hot dog." Plaintiff represented that at the time of the ultrasound, through the present, his right testicle has never been the size of a hot dog. Notwithstanding the putative size of Plaintiff's right testicle, Karanja-Adams concluded the ultrasound "was negative" and did not "show anything significant."

The record shows the ultrasound was limited to Plaintiff's scrotum. In a note the same day as the ultrasound, Karanja-Adams recorded the pelvic ultrasound had been "Cancelled. No clinical indication at this time." Despite this evidence, at the evidentiary hearing defense counsel argued the ultrasound was *not* limited to the scrotum. Defense counsel represented the ultrasound "included the groin." Thus, according to defense counsel, the ultrasound covered "[b]oth right and left testicles and his groin area above that." Defense counsel did not offer any evidence in support of this position nor did counsel explain why Karanja-Adams specifically noted the pelvic ultrasound had been cancelled.

Karanja-Adams discussed the ultrasound findings with Plaintiff on March 11, 2021. (*Id.* at 101, 103.) According to Karanja-Adams' notes, Plaintiff denied worsening pain or

---

[5] https://www.healthline.com/health/mens-health/average-testicle-size (last visited June 30, 2021).

- 4 -

any bladder or bowel dysfunction, stating, "[I]t's the same pain I just wish I had an answer." (*Id*. at 101.) Karanja-Adams' notes from that encounter state, in relevant part:

> *Reviewed [ultrasound] 3/3/21 – Small bilateral epidydimal cysts. A small right hydrocele
> ***Will request Urology consult as pt. w/ persistent pain and discomfort**
> *Pt advised to return to clinic if w/ signs of incarceration or torsion as discussed.
> *HNR as needed

(*Id*. at 103-104) (emphasis added.) Karanja-Adams subsequently signed a form attesting "I am recommending an Outside Consultation for the following: urology." (*Id.* at 107.) Plaintiff also signed that form, indicating he would attend a urology consultation if approved. (*Id*. at 107.)

The record does not disclose what occurred after Karanja-Adams executed the form recommending a urology consult. But according to Karanja-Adams' statements at the evidentiary hearing, she did additional research and spoke with the "site medical director" regarding the need for a urology consult given the ultrasound's findings. Karanja-Adams then claims to have decided, on her own, that a urology consult was not needed. Therefore, on March 31, 2021, Karanja-Adams noted in an addendum to her notes for March 11, 2021 "Urology consult r/t small epidydimal cyst not necessary at this time as pt. has no bladder dysfunction. Will continue to monitor [every six months] or when pt. submits HNR. Next appt on 4/5/21." (*Id*. at 104-105.)

At the evidentiary hearing defense counsel argued there was no evidence Karanja-Adams had ever stated she "will" seek a urology consultation. Defense counsel's representations are directly contradicted by the record as set forth above. According to counsel, Karanja-Adams merely noted a urology consult "might be . . . something she'd consider" but "once she looked closer at it did some more research and looked at all of the other test results, . . . she determined it wasn't necessary." That is incorrect. According to the medical notes, Karanja-Adams stated "Will request Urology consult." Karanja-Adams also signed a form stating "I am recommending an Outside Consultation for the following:

urology." It is difficult to see how counsel could, in good faith, represent Karanja-Adams had never determined a urology consultation was merited.[6] *Cf.* Fed. R. Civ. P. 11.

In any event, on April 5, 2021, Plaintiff saw Karanja-Adams again. (*Id*. at 108.) At that time he denied dysuria, hematuria, hesitancy, retention, urgency, or swelling. (*Id.*) Karanja-Adams reviewed the need for a urology consultation with Plaintiff and informed him the consultation was "not necessary at this time as [Plaintiff] has no bladder dysfunction." (*Id.* at 110.) Karanja-Adams indicated that she would order a scrotal strap for Plaintiff. (*Id.*)

Plaintiff was seen by Nurse Maurice Owiti on April 7, 2021, in response to an April 6, 2021 HNR. (*Id*. at 112, 121.) At that time, Plaintiff complained of "sharp and not constant" abdominal pain ranging from a 2-5 out of 10 but denied "any pain radiating to the right testicle." (*Id*.) Owiti noted the absence of any visible bulging and referred Plaintiff to a provider "for further evaluation." (*Id.* at 113, 116.)

On April 12, 2021, Plaintiff submitted another HNR reporting that his left testicle was "80% smaller" than it was in January 2021 and he was once more experiencing pain in his groin area and "strangulation" in his lower abdomen. (*Id.* at 131.) Plaintiff was evaluated by a nurse who recorded Plaintiff had been "referred to provider on 4/7/21 for this issue." (*Id.* at 126.) Thus, no additional action was taken at that time. On April 14, 2021, Karajana-Adams reviewed Plaintiff's records and, without seeing him, submitted a request for a scrotal strap. (*Id*. at 136.) Plaintiff received the scrotal strap shortly thereafter. (*Id.* at 137.)

Plaintiff was seen again by Karanja-Adams on April 20, 2021. (*Id.* at 141.) He reported a "new issue" on his right side, stating "I feel like a pain, you can't feel it, it's not bulging like right now but sometimes, it's not painful but it's there." (*Id*.) Karanja-Adams noted no obvious bulge, hernia, or mass, and told Plaintiff to continue his current treatment

---

[6] The Court inquired of counsel what records she was looking at and did not receive an adequate answer.

- 6 -

regimen and return to the clinic if he experienced "increase[d] pain or obvious mass." (*Id.* at 143.)

On April 24, 2021, Plaintiff submitted an HNR seeking a renewal of his ibuprofen prescription. (*Id.* at 203.) The following day, he submitted an HNR asking to speak to a provider regarding a potential urology consultation and stating that he would pay for the consult and transportation. (*Id.* at 172.) Karanja-Adams reviewed these requests on April 25, 2021, reordered Plaintiff's ibuprofen prescription, and entered an order for four different blood panels. (*Id.* at 149-151, 155.) Two of these panels—the prostate specific antigen test and the urinalysis—yielded normal results. (*Id.* at 165-69.) It is not clear whether the results from the third and fourth were normal. (*Id.* at 157-162.)

Plaintiff filed another HNR on April 28, 2021, stating his testicle was "still 80% smaller than it was in January" and was still causing him pain that was "very severe while laying down." (*Id.* at 182.) Plaintiff asked to be seen to discuss a "possible treatment plan." (*Id.*) Plaintiff was seen by Nurse Graciano the following day. (*Id.* at 173.) He reported pain levels of 6-10 out of 10 and stated the ibuprofen he was taking did not relieve his pain. (*Id.*) Plaintiff denied swelling, discharge, or issues with urination. Graciano referred him to a "provider for persistent pain." (*Id.* at 173, 177.)

Plaintiff was seen by Karanja-Adams on May 12, 2021, and reported veins protruding from his groin in an area above where the testicular ultrasound had been performed. (*Id.* at 183.) He denied dysuria, frequency, hesitancy, retention, or hematuria, and Karanja-Adams advised him to continue with his current treatment regimen and ordered an alpha-fetoprotein tumor-marker test. (*Id.* at 183, 185.) That test was completed and yielded normal results. (*Id.* at 189-90.)

Plaintiff does not dispute most of this history, but he describes numerous statements by medical providers that provide additional context. For example, Plaintiff states that when he was examined in January 2021, Nurse Pontius was "shocked" by the size reduction in his testicle and immediately referred him to a provider. (Doc. 5 at 5.) When Karanja-Adams subsequently examined Plaintiff, she allegedly agreed something was wrong. (*Id.*)

But when Plaintiff was seen a few weeks later, Karanja-Adams told him he was "not a priority" for ultrasound. (*Id.*)

In April 2021, Karanja-Adams allegedly told Plaintiff people could live years with a hernia, and that his condition was "no big deal." (*Id.*) When Plaintiff asked Karanja-Adams if she was diagnosing him with a hernia, she replied "no." (*Id.*) She told Plaintiff that he could address his medical issues when he got out of prison and that she would monitor him every three to six months. (*Id.*) Later in April, a nurse told Plaintiff "When reading your medical chart, I thought you were full of shit, but I actually believe you." (*Id.*) The nurse also told Plaintiff, "You need to see urologist," and instructed Plaintiff to tell the provider everything he had told the nurse. (*Id.*) Plaintiff replied, "[T]rust me, I have." (*Id.*) And when Plaintiff was seen by two nurses on April 28, 2021, the nurses "looked at each other in shock and said nothing." (*Id.* at 12.)

Plaintiff filed this suit in April 2021 and, in early May he filed an amended complaint along with his motion seeking a preliminary injunction. The Court concluded Plaintiff had stated a claim for "denial of constitutionally adequate medical care" against Karanja-Adams, Graciano, and numerous supervisory personnel ("Defendants"). (Doc. 9). Defendants were ordered to respond to the complaint and to respond to the request for a preliminary injunction. According to Defendants' opposition to the motion for a preliminary injunction, Plaintiff "simply disagrees with the providers' medical determinations" and he is not entitled to injunctive relief. (Doc. 31 at 2).

At the evidentiary hearing, the Court asked Karanja-Adams for her diagnosis of Plaintiff. Karanja-Adams responded

> So I'm not quite sure because I do not – actually I do not know because I haven't found anything. There's no finding whatsoever that could explain his consistent complaint of his pain. I really have found nothing.[7]

---

[7] Despite this acknowledgment of Plaintiff's "consistent" complaints of pain, defense counsel argued there are "inconsistencies in what [Plaintiff is] saying." The "inconsistencies" appear to be that Plaintiff has reported varying degrees of pain during the past six months. But it is not "inconsistent" for Plaintiff to report pain that varies throughout the day, particularly when he explained the level 10 pain occurs when he lies on his back to sleep.

When asked why Plaintiff's testicle suddenly shrunk in January 2021, Karanja-Adams stated "I can't explain. I can't explain why he has the pain. I cannot explain that." The Court then had the following crucial exchange with Karanja-Adams:

> **Court**: So other than you don't know if he had [a shrunken testicle] before and he never told you he had it before, you have – you have no reason to explain, [no] medical reason, why he had a sudden shrinking of one of his testicles?
> **Karanja-Adams**: I would defer that to a specialist to say that. I don't think I can confidently respond to that.

To reiterate, the undisputed facts are that Plaintiff has experienced a sudden shrinking of one of his testicles and has been in significant pain for approximately six months. Karanja-Adams does not know why Plaintiff is in pain nor does Karanja-Adams know why such a shrinking would occur. According to Karanja-Adams, only a "specialist" would be able to assess this situation. Yet Karanja-Adams and defense counsel remain adamant Plaintiff is not entitled to see such a specialist. The Court sometimes has difficult decisions to make, particularly in prisoner's allegations of mistreatment. This is not one.

**ANALYSIS**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff seeking a preliminary injunction must show (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And because Plaintiff is seeking injunctive relief requiring Defendants take "affirmative action," he "must establish that the law and facts *clearly favor* [his] position." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Finally, the Prison Litigation Reform Act requires injunctive relief be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**I.     Likelihood of Success on the Merits**

To prevail on an Eighth Amendment medical care claim,[8] a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, as to the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting *Estelle*, 429 U.S.C. at 104), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992)), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not

---

[8] Plaintiff does not argue that he is likely to succeed on the merits of his First Amendment retaliation claim.

amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Plaintiff has demonstrated a strong likelihood of success on his Eighth Amendment medical claim. Plaintiff previously required surgical repair of a recurrent hernia and has been seeking treatment for a shrunken testicle as well as groin and abdominal pain for approximately six months. While Defendants claim Plaintiff has been provided care consistent with his "current medical diagnosis," it is not clear what "diagnosis" Defendants are referencing. The only diagnosis Plaintiff has received since 2019 was a diagnosis of "other chronic pain" made sixteen months before he reported a decrease in testicle size and eighteen months before his ultrasound was performed. (Doc. 31-2 at 183-84.) In addition, Defendants' own records show that Plaintiff was denied access to two different diagnostic tools initially recommended by Karanja-Adams: a pelvic/lower abdominal ultrasound and a urology consultation. Although Defendants attempt to portray these reversals as reasoned determinations regarding a lack of medical necessity based on Karanja-Adams reevaluating Plaintiff's condition, their characterization is not supported by the record.

Defendants' explanation for Karanja-Adams's reconsideration of the pelvic/lower abdominal ultrasound is baseless. Defendants assert "[i]t was later determined"—by whom they do not say—"that based on the presentation and exam that [sic] only the testicular ultrasound needed to take place."[9] (Doc. 31 at 4.) Their failure to attribute this determination is telling, as the evidence cited does not reflect *any* basis for the cancelation of Plaintiff's pelvic ultrasound. (Doc. 31-2 at 41-51.) The only relevant evidence, a March 3, 2021 "Consultation Request Action" (Doc. 31-2 at 40), is too ambiguous to conclude Karanja-Adams was even responsible for this decision, much less that she made this decision based on further presentation and examination. That document merely indicates Karanja-Adams canceled the consultation request on March 3, 2021, noting, "No clinical

---

[9] At the evidentiary hearing, defense counsel appeared to backtrack from this position by arguing the pelvic ultrasound *did* occur. Defense counsel's constantly shifting positions makes it difficult to determine what, in fact, they are arguing.

indication at this time." There is no attribution of her decision to information gleaned from further evaluation or diagnostic testing. And Defendants offer no other evidence to explain why Karanja-Adams would have canceled this test months after she determined it was necessary and obtained Plaintiff's written commitment to attend such a test "if approved." (Doc. 31-2 at 32.) The unexplained cancelation of Plaintiff's pelvic/lower abdominal ultrasound months after Karanja-Adams determined it was warranted is significant evidence of deliberate indifference to Plaintiff's medical needs.

Defendants' explanation regarding Karanja-Adams's evolving view on a urology consultation is equally unpersuasive. Defendants contend Karanja-Adams "planned to inquire about a urology consult," but the consult "was determined ultimately not to be necessary" because "there was only a small cyst" and "no bladder dysfunction[,] . . . masses, etc." (Doc. 31 at 5.) This was also the explanation offered at the evidentiary hearing, although Karanja-Adams' testimony was not entirely clear on who she consulted and why she changed her opinion. In any event, Defendants' attempt to portray Karanja-Adams' initial recommendation as tentative runs contrary to the language and conduct evidenced in the record.

As outlined earlier, Karanja-Adams stated in her notes, "**Will request** Urology consult" (Doc. 31-2 at 103 (emphasis added.)) Karanja-Adams also signed a form stating she was recommending a urology consult and obtained Plaintiff's written commitment to attend a urology consultation if approved. (Doc. 31-2 at 107.) As for the statement in the record that lack of bladder dysfunction meant no urology consultation was necessary, that statement does not hold up when examined alongside other available evidence. Specifically, the records demonstrate Karanja-Adams concluded a urology consultation was necessary based on Plaintiff's "persistent pain and discomfort," *after* he had repeatedly denied experiencing bladder dysfunction. (Doc. 31-2 at 12, 22, 52.) In fact, Plaintiff "denie[d] bladder or bowel dysfunction" at the very same appointment in which Karanja-Adams noted she would request a urology consultation. (Doc. 31-2 at 101-103.) If bladder dysfunction were so critical to Karanja-Adams's determination, there is no explanation

why it did not matter until weeks after she requested a urology consult. Accordingly, the Court concludes Plaintiff has presented a strong likelihood of success on the merits of his Eighth Amendment claim.

Defendants cannot overcome this conclusion with Dr. Orm's conclusory opinion that Plaintiff has not been denied medically necessary care, that no Centurion nurse or medical provider "identified anything critically abnormal . . . that would constitute a medical crisis or emergency," and that a urology consultation is not medically indicated "[b]ased on imaging and exams." (Doc. 31-1 at 2-3.) Dr. Orm is an employee of Defendant Centurion, not an independent expert. And, as Plaintiff notes in his Reply, she does not purport to have examined Plaintiff personally or spoken with his providers; rather, her opinion is based solely on her review of his medical records. Dr. Orm's failure to identify the specific bases for her conclusion is therefore critical, as is her failure to reconcile that conclusion with Karanja-Adams's initial decision that Plaintiff's persistent unexplained pain warranted a consultation. In light of these factors, the Court finds Dr. Orm's opinion insufficient to negate the likelihood of success on the merits of Plaintiff's Eighth Amendment claim.[10] *Cf. Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (concluding, in the social-security context, that a contrary opinion of a non-examining medical expert only warrants rejection of treating or examining physician's opinion if it is consistent with other evidence in the record).

## II. Irreparable Harm

Plaintiff has shown the deprivation of proper medical care is likely to cause him irreparable harm in the form of continuing physical pain. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *Von Colln v. Cty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they"). While Defendants attempt to minimize Plaintiff's

---

[10] In light of the Court's findings, Defendants' argument regarding mootness is untenable. Plaintiff's request for a urology consultation and recommended treatment cannot have been mooted by an alternative treatment plan that has yet to yield a diagnosis.

pain, emphasizing his early characterizations of it as "dull" and "achy," they cannot credibly argue he is unlikely to suffer pain in the future when their own evidence demonstrates he has been reporting pain on a regular basis since January 8, 2021.

Moreover, many of Defendants' assertions regarding Plaintiff's pain level are belied by the evidence, which demonstrates that while Plaintiff's pain level may fluctuate, it has *trended* higher. And any suggestion that Plaintiff is exaggerating his pain is difficult to square with Karanja-Adams's recent decision to provide him a scrotal strap, evidence that Plaintiff has attempted to relieve his pain through other methods, like yoga and adaptive behavior, and that Plaintiff has offered to bear the cost of a urology consultation. There are no indications Plaintiff's pain is trivial.

Finally, while Defendants make much of the fact that Plaintiff declined pain medication when it was offered to him on January 11, 2021, his pain has increased since that time. In addition, Plaintiff's verified allegations, and his statements at the evidentiary hearing, demonstrate his desire for a diagnosis compelled him to avoid medication that would mask his symptoms.[11] Plaintiff has demonstrated a sufficient likelihood of irreparable harm to warrant the requested injunctive relief.

### III. Balance of Hardships

In arguing the balance of hardships, Defendants largely repeat the arguments they mounted in opposition to the merits of Plaintiff's claim. They also contend that they would be forced to overhaul their policies in response to a grant of injunctive relief, potentially resulting in "security and safety breaches and inmate unrest."

Defendants' argument regarding the merits of Plaintiff's claim has already been rejected. And in the absence of any explanation as to why the requested relief necessitates a wide-scale policy overhaul or how that overhaul could lead to a security lapse, the Court finds the second argument unpersuasive. *See Figueroa v. Centurion of Arizona, LLC*, No. CV 20-00064-TUC-RM, 2020 WL 8673996, at *3 (D. Ariz. Nov. 4, 2020) ("The Court is

---

[11] At the hearing, Karanja-Adams agreed pain medications could mask potential issues.

- 14 -

unconvinced by Defendants' general argument, without citation to any procedure or policy, that 'restructuring the procedures and policies for one single inmate could result in security and safety breaches [and] inmate unrest and staffing issues.'"). Plaintiff has credibly alleged ongoing, increasing pain, the source of which Defendants are unwilling to identify. The balance of hardships tips sharply in Plaintiff's favor. *See Rodde*, 357 F.3d at 999 ("[f]aced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor") (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

**IV.    Public Interest**

The prevention of constitutional violations is always in the public interest. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Moreover, "the public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *McNearney v. Wash. Dep't of Corr.*, No. C11–5930 RBL/KLS, 2012 WL 3545267, at *16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)); *see Farnam v. Walker*, 593 F. Supp. 2d 1000, 1017 (C.D. Ill. 2009) (holding that the public had an interest in the maintenance of prisoner's health during the pendency of the lawsuit).

Although Defendants claim the provision of unnecessary medical care is not in the public interest, the Court has already found Plaintiff is likely to prevail on his claim regarding the constitutional adequacy of his care. Accordingly, the last *Winter* element favors Plaintiff.

**V.    Narrowly Tailored Relief**

The Prison Litigation Reform Act ("PLRA") requires any injunctive relief to be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2). The Court must also be mindful of the impact on prison operations and security. *Id.*

Plaintiff requests an injunction requiring Defendants to provide him a consultation with a urologist and provide treatment in accordance with the plan developed by that

doctor. The Court finds the least intrusive means is to require a urology consult. The parties will then be required to provide the urologist's report and proposed plan of care to the Court for the Court to determine whether that plan must be implemented or if other remedies are appropriate.

**VI. Security**

Defendants do not address the amount of security or provide any evidentiary support regarding the need for a bond. "The court has discretion to dispense with the security requirement" in appropriate cases. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985)). Here, no bond is appropriate.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Motion for Injunctive Relief.

(2) Plaintiff's Motion for Injunctive Relief (Doc. 8) is **granted** as follows: Defendants must provide Plaintiff with a urology consultation within **21 days of this Order**.

(3) Defendants must file a notice of compliance and status report with the Court within **7 days** of Plaintiff's urology consultation.

Dated this 1st day of July, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge